517 So.2d 576 (1987)
Jack GADD
v.
John A. THOMPSON.
No. 58630.
Supreme Court of Mississippi.
December 16, 1987.
*577 F. Edwin Perry, Oxford, for appellant.
Ben J. Piazza, Jr., Keyes, Moss, Piazza & Woods, Jackson, for appellee.
En Banc.
ANDERSON, Justice, for the Court:
This is an appeal from a decree of a special tribunal in an election contest. The decree held that Jack Gadd was disqualified for election to State House of Representatives for District Thirteen.
In August 1985, Gadd was hired as an assistant women's basketball coach at the University of Mississippi. Until that time, he and his wife had lived at Hickory Flat in Benton County. Commuting proved inconvenient for Gadd, so he bought a house in Oxford, into which his family moved in January 1986. It is undisputed that after that date, the Oxford house was the family's actual residence. The Gadds owned no real property in Benton County. However, they continued to register their cars in that county, and requested that the county clerk keep them on the voting rolls there. There is evidence that Gadd told a number of people that he meant to return to Hickory Flat after the Ole Miss job was over.
On March 13, 1986, Gadd's wife Merri filed for a homestead exemption on the Oxford house. Item 4 on the exemption application states: "I am a bona fide, legal resident of Mississippi and this is the home of my family group, wherein we did reside on January 1, 19__." The blank is filled in with the numerals "86", and the yes or no boxes at the side are marked "yes." On January 7, 1987, the Gadd's taxes were paid by their mortgage company, a $90 credit for homestead exemption being allowed. The same procedure was followed when their city taxes were paid to Oxford on March 12, 1987.
In the spring of 1987 Gadd began to think about running for the State Legislature for House District 13. This district consists of part of Benton, DeSoto and Marshall counties; it does not include Oxford or any part of Lafayette County. On May 29, 1987, Gadd submitted his qualifying statement of intent declaring his candidacy for the democratic nomination for Representative for District 13. He attested he was a "qualified elector for the County of Benton" giving his mailing address as P.O. Box 161, Hickory Flat.
On June 11, 1987, John A. Thompson, a rival candidate for District 13 nomination, petitioned the State Democratic Party Executive Committee for the de-certification of Gadd on the ground that he was a resident of Lafayette County and therefore, not a resident of District 13. Hearings *578 were held, at which Gadd presented an affidavit from the deputy tax assessor of Lafayette County stating that the Gadd's had received no homestead exemption on their Oxford property in 1986 or 1987. (Gadd, had, in fact, received the exemption, but had refunded the amounts credited as soon as he understood the possible impact of the exemption on his eligibility for office.)
The party committee decided to uphold Gadd's original certification. The first Democratic primary was held on August 4. Jack Gadd received an absolute majority of the vote in District 13, obviating a run-off and making him the official Democratic candidate. (Since no Republican or independent had qualified, victory in the Democratic primary was tantamount to election in that district.)
Meanwhile, Thompson was unsuccessfully pursuing his appeals through the Democratic Party organization. These having been exhausted, at length he filed a petition for judicial review pursuant to Mississippi Code Annotated, Section 23-15-927, et seq. (Supp. 1987).
After hearing the evidence, the judge found as a fact that, their affidavits to the contrary notwithstanding, the Gadds had obtained homestead exemption on their property in Oxford. His principal conclusion of law was as follows:
Regardless of all these other deep and binding and long-standing attachments to Benton County, the purchase of the home and application and obtaining of homestead exemption and the benefit thereunder in tax relief manifested an intent for that to be their residence and it was until changed in June 1987. Therefore, Mr. Gadd could not become a member of the House of Representatives of Mississippi under Article 4, Section 41 [Miss.Const.]
The judge then ordered a new primary election to be held on the same day as the general election with any necessary run-off to be held two weeks later. As a result of these elections, Andy Morris, who is not a party to this litigation, won the second primary election on November 18 and will thus take his seat in the legislature.

I. IS THE FILING OF A HOMESTEAD EXEMPTION CONCLUSIVE EVIDENCE THAT THE PARTY SO FILING IS DOMICILED IN THE COUNTY OF FILING?
Article 4, Section 41 of the Mississippi Constitution provides in part:
No person shall be a member of the House of Representatives ... who shall not have been a resident citizen of the State four years and of the county two years, immediately preceding his election.
This Court has consistently held that for election purposes, residency and domicile are synonymous in Mississippi. Hubbard v. McKey, 193 So.2d 129, 132 (Miss. 1966); Jones v. State, 207 Miss. 208, 214, 42 So.2d 123, 125 (1949). Therefore, the key issue in this appeal is whether or not Gadd's filing for homestead exemption in Oxford created his domicile there.
Our definition of domicile was handed down in 1943. In order to be an actual bona fide resident of a county, "there must have been (1) an actual residence voluntarily established in said county, (2) with the bona fide intention of remaining there, if not permanently, at least indefinitely." Smith v. Smith, 194 Miss. 431, 434, 12 So.2d 428, 429 (1943). Accord, Stubbs v. Stubbs, 211 So.2d 821, 824 (Miss. 1968). Thus, in the case at bar, the important question is whether filing for homestead exemption establishes Gadd's animus manendi. Is the homestead exemption conclusive evidence that Gadd intended to remain in Lafayette County indefinitely? Thompson relies on the case of Hollowell v. Vandevender, 358 So.2d 1328 (Miss. 1978). In that case the Hollowells sought to register as voters in Issaquena County, when they had obtained tax exemptions upon their homestead in Washington County. The Hollowell's homestead exemption application contained the printed attestation: "This is the bona fide and only home of my family group wherein we actually reside *579 and did on January 1." This Court, laying considerable emphasis on the word "only" in the application, held that the Hollowells were estopped from asserting that the representation on the application was not true. 358 So.2d at 1329.
In the present case, a different application for homestead exemption was used by the Gadds. It nowhere represents the Oxford home as being the "only" home of the Gadd family. In addressing this question the special judge's opinion stated, "and the word `only' does not appear in the application which Mrs. Gadd signed, but the words were `the home of the parties of the family group,' and `the' is an exclusive thing as used there and I believe it restricts it to the home."
We could find only one case discussing the restrictive effect of the article "the" in a context even remotely similar to this one. In one Texas case, a deed to a real estate lot contained the building restriction requiring "the" dwelling house on the lot to face the street. The court held that in this context use of the expression "the" dwelling house necessarily implied that no more than one would be built on that lot. Fischer v. Reissig, 143 S.W.2d 130, 131 (Tex.Civ. App. 1940). This result comports well with what the special judge did in the present case, since the law does not ordinarily contemplate that a person should have more than one voting domicile.
We hold as a matter of law that the filing of a homestead exemption conclusively establishes domicile for electoral purposes in the county of filing, regardless of circumstances indicating that certain ties to other counties still exist.

II. CAN A POLITICAL CANDIDATE REVOKE HIS APPLICATION FOR HOMESTEAD EXEMPTION AND THE EFFECT THEREOF ON HIS DOMICILE BY REPAYING THE AMOUNT CREDITED UNDER THE EXEMPTION?
It is undisputed that as soon as Jack Gadd understood that his filing for homestead exemption had jeopardized his chances of running for the legislature in Benton County, he went immediately to the Oxford City Hall and Lafayette County tax assessor and repaid the amounts credited to him under the homestead exemption.
Gadd argues that since MCA § 27-33-41(k) (Supp. 1987) gives the State Tax Commission a period of a year in which to disallow an application for a homestead exemption, a taxpayer ought to be able to revoke his application during the same period. No authority is cited for this. It must be remembered that Gadd did not refund his credit until after he had received it; his case would be much stronger if he had rescinded his application before receiving the benefit of it. We found no case on this issue, but it seems that sound considerations of policy support the rejection of Gadd's argument. If taxpayers were allowed to do what Gadd proposes, very undesirable consequences could ensue. For example, a debtor could foil his creditors by designating certain property as his homestead, thereby preventing the creditors from levying on it, and then refund his credit and change his homestead as soon as he thought the coast was clear. This would be an open invitation to chicanery and deceit.
For the foregoing reasons, the special judge's decree must be affirmed. Jack Gadd is de-certified as the Democratic nominee for State Representative, District 13. Andy Morris is hereby declared the lawfully elected representative for that district.
AFFIRMED.
ROY NOBLE LEE, C.J., and PRATHER, ROBERTSON, SULLIVAN and ZUCCARO, JJ., concur.
HAWKINS and DAN M. LEE, P.JJ., and GRIFFIN, J., dissent.
GRIFFIN, Justice, dissenting:
I respectfully dissent from the majority opinion and as basis therefor respectfully submit that the chancellor, sitting as a special tribunal, lacked subject matter jurisdiction to entertain the lawsuit. The suit was filed challenging the qualifications, residence, of Gadd and therefore was not an election contest within the contemplation of the statutes. This question should *580 have been submitted to another forum and not to a special tribunal only empowered to ascertain the will of the qualified electors participating in the party primary which included the power to determine the qualifications of the electors, not the candidates, and whether in all substantial respects the election was fairly and honestly held in compliance with the various provisions of the law. McKenzie v. Thompson, 186 Miss. 524, 191 So. 487 (1939).
Jurisdiction over the subject matter, therefore, cannot be conferred at the will of one of the parties nor even by the consent of all of them; and, the entire and manifest want of jurisdiction of the subject matter may be raised at any time by any party to the cause, or by the court itself; and although not raised, the rule is further effectuated in such a case by making the decree or judgment void even after being rendered and entered of record... .
Griffith's Mississippi Chancery Practice, Section 22.
The limits of the jurisdiction of the special (statutory) tribunal to hear election contests has been previously determined by this Court. One of the more concise statements is found in McKenzie v. Thompson, supra. There, Frank McKenzie, a losing candidate for sheriff, challenged the nomination of Mack W. Thompson as the Democratic nominee for that office on the sole ground that he was not a qualified elector of Forrest County. The Court disposed of the matter as follows:
Appellant, McKenzie, contested the nomination of appellee, Thompson, as the Democratic nominee for sheriff of Forrest County. The Democratic executive committee of the county declared Thompson nominated. McKenzie instituted proceedings under the Corrupt Practices Act (Chapter 19, Laws of 1935, Ex.Sess.) to contest the nomination before the special court provided for in that act. The trial resulted in the judgment of that court declaring Thompson the nominee. From that judgment, McKenzie appeals.
The only question is whether McKenzie was entitled to contest Thompson's nomination upon the ground alone that he was not a qualified elector of the county. Thompson's position is that his qualifications for the office are not involved in a proceeding of this character. We so hold and reach that conclusion upon the following considerations: The special tribunal set up by the Corrupt Practices Act has no authority to go beyond ascertaining the will of the qualified electors participating in the party primary. To that end, it has the authority and duty to determine whether those voting or offering to vote are qualified electors and entitled to vote, and whether in all substantial respects the election was fairly and honestly held in compliance with the various provisions of the law. Hayes v. Abney (Miss.) [186 Miss. 208], 188 So. 533 [(1939)].
We think by analogy this question was governed by the principles applicable to contests between candidates in a general election. It is a public question, not a private one. The only remedy is after the general election in the nature of a quo warranto under Section 3053, Code of 1930, which provides for such a remedy in the name of the state against any person who unlawfully holds or exercises the functions of a public office. May v. Young, 164 Miss. 35, 143 So. 703 [(1932)]; Omar v. West (Miss.), [186 Miss. 136], 188 So. 917 [(1939)]. (Emphasis added)
McKenzie does not claim that he was nominated by receiving a majority of the votes, but that Thompson was not because he was not eligible to the office. In other words, he admits that Thompson got the majority of the legal votes cast, but they should not be counted for him because of his disqualification to hold the office. That is a public question, and not a private one.
Later, in Blakeney v. Mayfield, 226 Miss. 53, 83 So.2d 748 (1955), this Court in an opinion by Justice Lee, addressed a similar question. The qualifications of the respondent, defendant in an election contest, were challenged on the grounds that he had violated the Corrupt Practices Act. The special tribunal held it was without *581 jurisdiction in an election contest to determine such a question. This Court upheld the lower tribunal with the following language:
A similar question as to the authority of a special court, set up under the Corrupt Practices Act, to inquire into the qualification or disqualification of candidates in primary elections was raised in the case of McKenzie v. Thompson, 186 Miss. 524, 191 So. 487, 488. In that case, McKenzie contested the nomination of Thompson on the Democratic ticket for the office of sheriff on the ground that Thompson was not a qualified elector of the county; but the executive committee declared Thompson as the nominee. A special court, organized under the Corrupt Practices Act, confirmed Thompson as such nominee. On appeal, this Court said: "The only question is whether McKenzie was entitled to contest Thompson's nomination upon the ground alone that he was not a qualified elector of the county. Thompson's position is that his qualifications for the office are not involved in a proceeding of this character. We so hold and reach that conclusion upon the following considerations: The special tribunal set up by the Corrupt Practices Act has no authority to go beyond ascertaining the will of the qualified electors participating in the party primary. To that end it has the authority and duty to determine whether those voting or offering to vote are qualified electors and entitled to vote, and whether in all substantial respects the election was fairly and honestly held in compliance with the various provisions of the law. Hayes v. Abney [186 Miss. 208] 188 So. 533.
"We think by analogy this question is governed by the principles applicable to contests between candidates in a general election. It is a public question, not a private one. The only remedy is after the general election in the nature of a quo warranto under Section 30553, Code of 1930, which provides for such a remedy in the name of the state against any person who unlawfully holds or exercises the functions of a public office. May v. Young, 164 Miss. 35, 143 So. 703; Omar v. West, [186 Miss. 136] 188 So. 917."
In other words that case held that the special tribunal had no authority to pass on or determine that Thompson, on the ground that he was not a qualified elector, was disqualified from holding the office of sheriff, and, for that reason, could not be the nominee for that office.
By the same token, neither did the special tribunal in this case have the authority to determine that Mayfield, because of the alleged violations of the Corrupt Practices Act, as set out in the contest, was disqualified from holding the office of supervisor, and for that reason could not run in the Democratic primary and perhaps become the nominee for that office.
Appellants cite a number of authorities from other jurisdictions, but those cases are worth very little since our Court has already established a precedent on the governing principle here involved.
The judgment of the special tribunal is affirmed; and this action also disposes favorably of the appellee's motion to dismiss the appeal.
The same rule has been announced on several occasions in contests of general and special elections which are held under a separate statute and not by a special tribunal. The Court noted therein other procedures, quo warranto in particular, for the removal of officeholders who were disqualified. The officeholders' qualifications are a public question not a private one. The private side is over who got the most legal votes and not over qualifications. Warren v. State, 163 Miss. 817, 141 So. 901 (1932); May v. Young, 164 Miss. 35, 143 So. 703 (1932) (wherein it was expressly stated that the fact that the contestee was disqualified from holding office did not affect legality of votes cast for him), and Wisinger v. McGehee, 160 Miss. 424, 134 So. 148 (1931).
The contestant in this case had a remedy by quo warranto as was clearly announced in Muirhead v. State Board of Election Commissioners, et al., 259 So.2d 698 (Miss. 1972). Or he could have addressed the matter to the legislature itself. Section 38 *582 of the Mississippi Constitution provides as follows: "Each house shall elect its own officers, and shall judge of the qualifications, return an election of its own members."
It might be argued that the Rules of Civil Procedure would permit these special tribunals to expand their jurisdiction, however, Section 82(a) of the Rules strike a fatal blow to this argument. It is there stated: "These rules shall not be construed to extend or limit the jurisdiction of the courts in Mississippi." We would need to amend the rule if we want to extend the authority of the special tribunals in election contests, amending not only Section 82(a) but 81(a) as well, because it is there provided: "These rules apply to all civil procedures but are subject to limited applicability in the following actions which are generally covered by statutory procedures ... (4) procedures pertaining to election contests... ."
For clarification, and for that purpose only, a short review of the history of these statutes may well be in order. In 1935, Mississippi was without question a one-party state, and the Democratic primaries determined the officeholders for the next four years. The legislature and the governor, having a desire to insure clean elections, adopted the Corrupt Practices Act, Chapter 19, Laws of 1935, and included therein a method whereby election contests might be conducted by a special tribunal created by that Act. The pertinent portions of the Act pertaining to judicial review of election contests appeared in the Code of 1972 as §§ 23-3-45, et seq. (now repealed) with only minor amendments. In 1986, the legislature adopted Chapter 495 of the General Laws of that year, and Title XIV thereof, entitled "Election Contests," provided for a contest of primary elections, incidentally, for the first time contested legislative elections are mentioned. The appropriate sections of that chapter are Section 280, et seq., now appearing as §§ 23-15-921, et seq., Miss. Code Ann., as amended. Though there be some non-substantive change in language, the contests are still conducted exactly as provided by the Corrupt Practices Act of 1935 and the duties and powers of the judge or chancellor sitting as special tribunals still remain the same; that is, to hear and determine said contests or complaint de novo and enter the judgment which the county executive committee should have entered. Here since it was a legislative district embracing more than one county, the contest under the present statute should be directed to the state executive committee and on judicial review to a judge in Hinds County.
Simply in passing, I note that the chancellor ordered a new election allowing new candidates to qualify. His authority to do this does not leap out from the statute. However, as we have noted, this Court has held on several occasions that an election contest is a private fight. Since the fight is private, it would appear a little strange that the referee would invite the audience to join. However, this matter is not before us and we pass no opinion thereon.
Another historic note, §§ 23-5-191 and 193 of the Code of 1972 before amendment have been a part of the Mississippi Code since 1857. They read as follows:
§ 23-5-191. How election to legislature contested; notice; taking proof.
The person contesting the seat of any member of the senate or house of representatives shall, within thirty days after the election, serve notice, in writing, upon such member, stating particularly the grounds upon which the election is contested. Thereupon either party may proceed to take the deposition of witnesses before any justice of the peace, or other officer qualified to administer oaths in the district or county, as convenient as may be to the residences of the witnesses. The depositions so taken shall be read as evidence before the senate or house as the case may be; but the opposite party shall have ten days' notice of the time and place of taking the same.
§ 23-5-193. Attendance of witnesses.
Each house of the legislature, or any committee appointed to investigate the facts concerning the election or qualifications of any member or person claimed to be such, shall have power to compel the *583 attendance of witnesses and the production of such documents or papers as may be required.
The above sections were re-adopted by §§ 293 and 294 by Chapter 495, Laws of 1986, and appear under a sub-topic entitled "Contest of Other Elections," and now appear as §§ 23-15-955 and 957 of our Code. Presumably the previous sections of said Chapter 495 embracing contests of primary elections would allow an election contest of a primary election for a legislative office by a special tribunal and a contest of a general or special election for such office before the respective house of the legislature. However, this question is not before us here.
Sympathy should be extended to the Learned Chancellor who was called upon to make a quick call. We enjoy the pleasure, though dubious, of Monday morning quarterbacks. What I consider to be the principal question in this case was never presented to the chancellor. What happened here reveals that busy trial judges need assistance and we take this occasion, since a legislative office is involved, to suggest that law clerks for the trial judges would be of invaluable assistance and would, in all probability, advance the administration of justice and, again in all probability, save the court's time and the state's money.
For the reasons stated above, I would reverse and render, inasmuch as we have a judgment of a special tribunal which was without subject matter jurisdiction. We should leave this matter to be addressed by that separate branch of the government, the legislature, in accordance with powers delegated to it by Section 38 of the Constitution.
HAWKINS and DAN M. LEE, P.JJ., join this opinion.